# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LEGACY CHRISTIAN CHURCH,

        *Plaintiff,*

  vs.

REPUBLIC-VANGUARD INSURANCE
COMPANY,

        *Defendant.*

Case No. 2:20-cv-02474-EFM

## MEMORANDUM AND ORDER

Before the Court is Defendant Republic-Vanguard Insurance Co.'s Motion for Summary Judgment on Plaintiff Legacy Christian Church claims for garnishment, breach of contract, statutory attorney's fees under K.S.A. § 40-256, and declaratory judgment. Plaintiff brought its claims against Defendant after having been assigned all rights by one of Defendant's insured, Steve Willman. Plaintiff also was assigned all rights by Craftsman Services, Inc. Whether Craftsman Services, Inc. was insured by Defendant is one of the key issues in this case. For the reasons set forth below, the Court denies Defendant's Motion.

## I.      Factual and Procedural Background

Plaintiff has brought several claims against Defendant that were assigned to it by Steve Willman and Craftsman Services, Inc. This means that there are really two cases before the

Court—Plaintiff's present case against Defendant and Plaintiff's previous case against the (allegedly) insured, Craftsman Services, Inc. ("Services"), which the Court will refer to as the Underlying Case.

Defendant is an insurance company incorporated in Arizona and with its principal place of business in Texas. Plaintiff is a Kansas not-for-profit corporation with its principal place of business in Johnson County Kansas. Steve Willman is an individual who has owned and operated a construction corporation in Kansas under a revolving door of different names. Prior to May 2012, Willman designated his corporation as Construction Consultants, Inc. d/b/a Bulldog Exteriors. In May 2012, Willman changed the name to Craftsman Exteriors, Inc., and again changed the name to Craftsman Services, Inc. on June 18, 2015.

Willman obtained a Commercial General Liability Policy (the "Policy") from Defendant to run from November 14, 2012, to November 14, 2013. The Policy originally covered Steve Willman as an individual but was amended to change the named insured to "Steve Willman dba Craftman [sic] Exteriors." Under the Policy, Defendant had a duty to defend the insured as to any lawsuits against it and the insured had a duty to cooperate with Defendant. Specifically, the insured had to "[i]mmediately send us [Defendant] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit' . . . [and] [c]ooperate with us in the investigation or settlement of the claim or defense against the 'suit.' " The Policy also contained numerous exclusion provisions, discussed in depth by the parties, which the Court finds irrelevant here because the outcome of Defendant's Motion rests on other factual issues.

Plaintiff purchased the building at issue in the Underlying Case in 2015. In March of 2012, the previous owner had hired Construction Consultants, soon to be known as Craftsman Exteriors, to perform repair work on the roof. It is unclear exactly when Craftsman Exteriors started and

completed work on the roof.  On January 19, 2018, Plaintiff sued "Craftsman Services, Inc. d/b/a Bulldog Exteriors" for damages due to its defective work on the roof.  In its Petition, Plaintiff named Willman as Craftsman Services' registered agent and noted that Craftsman Services had been known as Craftsman Exteriors during the period in question.  Willman failed to notify Defendant of the lawsuit against Craftsman Services.

On November 9, 2018, an attorney for another insurance company, Joel Riggs, sent a letter to Defendant regarding the ongoing lawsuit "against an insured of Republic-Vanguard Insurance Company, to wit: Craftsman Exteriors, Inc."  Riggs inquired as to Defendant's intent to defend or indemnify Craftsman Exteriors.  Defendant forwarded Riggs' letter to U.S. Administrator Claims ("USAC").  A USAC representative sent a letter to Willman falsely informing him that he had to pay a deductible before USAC would begin adjusting his claim.  The representative attempted to contact Riggs with no success.  Besides one conversation with Willman, the representative had no contact with him.

On September 14, 2019, a subcontractor for USAC, James Higgins, sent a letter to Willman informing him that Higgins was investigating the claim.  Higgins sent another letter requesting documentation from Willman on October 15, 2019.  Shortly after that, Higgins drafted a letter of denial, sending it to the director of the USAC for approval.  A USAC representative testified that the letter was sent.  However, no record of USAC sending it exists, despite the numerous records of drafts of the letter with the disclaimer "Proposed Letter of Denial" written across the top. Furthermore, the USAC representative testified that he had never observed any version of the letter not containing that disclaimer nor had he ever seen a letter sent out which did.  Willman never received the letter.

On November 8, 2019, the parties to the Underlying Case reached a settlement agreement (the "Agreement") and entered into a covenant not to execute against Willman and Craftsman Services. The Agreement provided, among other things, that: (1) Willman admitted to Craftsman Services culpability; (2) damages would be determined by the Johnson County Court based on evidence provided by Plaintiff; (3) Plaintiff could amend its Petition; and (4) Craftsman and Willman assigned all rights against Defendant to Plaintiff. Willman did not inform Defendant of this Agreement.

On January 3, 2020, Plaintiff filed an amended petition, naming Steve Willman as an additional party and adding new causes of action. The parties swiftly moved for an evidentiary hearing regarding Plaintiff's damages. That hearing was held on January 13, 2020. Based on evidence provided solely by Plaintiff, the judge found that Craftsman Services was liable to Plaintiff for damages of $858,954.93. Invoices show that Plaintiff had been billed for that amount by the companies it hired to replace the roof due to Craftsman Exteriors' deficient work. Furthermore, Plaintiff had solicited numerous bids which constituently exceeded $1 million. The judge specifically noted that "[t]he damages incurred by Legacy to replace the roof on the Property were necessary and reasonable."

Having acquired Willman's rights under the Policy against Defendant, Plaintiff demanded payment from Defendant for its judgment against Willman and Craftsman Services. When Defendant declined, Plaintiff brought claims against Defendant for garnishment, breach of contract, statutory attorney's fees under K.S.A. § 40-256, and declaratory judgment in Kansas state court. Defendant thereafter removed the case to federal court under the Court's diversity jurisdiction.

-4-

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[1]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[2]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[3]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[4]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[5]  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[6]

## III.    Analysis

### A.    Genuine issues of material fact exist as to whether Defendant breached its duty to defend its insured under the Policy

This is a legally and factually complicated case.  As discussed more below, the Court doubts that all the issues before it are proper for resolution at summary judgment.  However, genuine issues of material facts regarding the substance of Plaintiff's claims prevents the Court from granting Defendant summary judgment.   In arriving at this conclusion, the Court will

---

[1] Fed. R. Civ. P. 56(a).

[2] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[3] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[4] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[5] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[6] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

examine: (1) whether the Policy covered Craftsman Exteriors, Inc.; (2) whether Craftsman Exteriors, Inc. was a party to the Underlying Case; (3) whether Defendant breached its duty to defend Craftsman Exteriors, Inc.; and (4) whether Willman's breach of the cooperation clause relieved Defendant on its duty to defend.

> ### 1.    Did the Policy cover Willman individually or did it include his corporation, Craftsman Exteriors, Inc.?

The first matter the Court must determine is whether the Policy provided coverage for Willman alone or whether it provided coverage to his corporation, Craftsman Exteriors, Inc. Interpreting an insurance policy, like interpreting any contract, is a question of law.[7]  Under Kansas law, "a court should consider the instrument as a whole and try to ascertain the parties' intention from the language used, taking into account [1] the situation of the parties, [2] the nature of the subject matter, and [3] the purpose to be accomplished."[8]

Ambiguous provisions are construed against the insurer[9] and necessitate examining what "a reasonably prudent insured would understand the language to mean, not [] what the insurer intended the language to mean."[10]  As defined by the Kansas Supreme Court:

> To be ambiguous, a contract must contain provisions of language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning.[11]

---

[7] *Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 275 Kan. 698, 71 P.3d 1097, 1120 (2003).

[8] *Am. Special Risk Mgmt. Corp. v. Cahow*, 286 Kan. 1134, 192 P.3d 614, 621 (2008).

[9] *See Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 189 F. Supp. 2d 1212, 1215–16 (D. Kan. 2002); *McLean v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 60 Kan. App. 2d 283, 493 P.3d 968, 974 (2021).

[10] *Cahow*, 192 P.3d at 621.

[11] *Brumley v. Lee*, 265 Kan. 810, 963 P.2d 1224, 1226–27 (1998) (quotations omitted).

To determine whether the Policy included Craftsman Exterior, Inc. requires this Court to examine the cloudy body of law surrounding parties "doing business as" or "d/b/a" under another name. Most courts appear to agree that " 'd/b/a' . . . is merely descriptive of the person or corporation who does business under some other name."[12] Therefore, "[d]oing business under another name does not create an entity distinct from the person operating the business."[13] Instead, "the individual who does business as a sole proprietor under one of several names remains one person, personally liable for all his obligations."[14]

In the context of insurance policies covering individuals "d/b/a" another name, the distinction becomes much hazier. That is largely because the issue in these cases is not the legal effect of the term "d/b/a" but rather what the parties intended by including such language. There is no binding or instructive Kansas caselaw on point. Therefore, the Court "must make an 'Erie guess' and determine in its best judgment how the Kansas Supreme Court would resolve the issue.[15] Here, that means looking to other jurisdictions for guidance.[16]

---

[12] *Duval v. Midwest Auto City, Inc.*, 425 F. Supp. 1381, 1387 (D. Neb. 1977), *aff'd* 578 F.2d 721 (8th Cir. 1978) (as cited without further comment by *Farm Bureau Mut. Ins. Co., Inc. v. Tatum*, 2001 WL 37132501, at *3 (Kan. Ct. App. 2001)).

[13] *Id.*

[14] *Id.*; *see also Turner v. Metro. Prop. & Cas. Ins. Co.*, 2021 WL 432172 (N.D. Okla. Feb. 8, 2021) ("Although Plaintiff identifies himself individually 'd/b/a Afton Air and Lights, LLC,' the Court notes that the designation 'd/b/a' means 'doing business as' but is merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity distinct from the person operating the business. The business name is a fiction, and so too is any implication that the business is a legal entity separate from its owner.") (further citation, quotations, and alterations omitted).

[15] *N. Nat. Gas Co. v. Approximately 9117 Acres In Pratt, Kingman, & Reno Ctys.*, Kan., 114 F. Supp. 3d 1144, 1157 (D. Kan. 2015), *aff'd in part, rev'd in part on other grounds sub nom. N. Nat. Gas Co. v. L.D. Drilling*, 862 F.3d 1221 (10th Cir. 2017).

[16] *See id.* ("[T]he court may consider state intermediate appellate decisions, decisions of other states, federal decisions, and the general weight and trend of authority.") (citing *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988)).

In *Young v. Ray America, Inc.*,[17] an insurance policy listed "Dennis and Marjorie Klatt, DBA Klatt Real Estate, Inc.," as the named insured.[18]  The court held that language to be "ambiguous and uncertain" in that "[t]he policy may be construed as providing coverage to the Klatts individually, to Dennis Klatt Real Estate, Inc., or to both the Klatts individually and Dennis Klatt Real Estate, Inc."[19]  As another point of reference, the court in *Hertz Corp. v. Ashbaugh*[20] held that "Tilman H. Ashbaugh dba Corky's Wrecker Service" could reasonably be interpreted "to mean Corky's Wrecker Service only, and not to include Tilman H. Ashbaugh individually."[21]  These cases taken together show that inclusion of "d/b/a" language without clarification invites ambiguity as to the parties' intent.

Here, it is undisputed that the Policy was amended to cover "Steve Willman dba Craftman [sic] Exteriors."  Despite the obvious typo and notably absent "Inc.," this language is "ambiguous and uncertain" as to what the parties intended to cover, as Defendant admits in its Reply.  A reasonable interpretation of the Policy could be that it was intended to cover Willman personally and not extend to his corporation under which he operated his whole business.  Another reasonable interpretation is that by adding "d/b/a Craftsman Exteriors," the parties intended to extend coverage to Willman's corporation.  Examining the situation and purpose of the parties as required by Kansas law, this latter interpretation becomes even more reasonable because Willman was operating Craftsman Exteriors, Inc. at the time the Policy was executed.  There is no evidence

---

[17] 673 S.W.2d 74 (Mo. Ct. App. 1984).

[18] *Id.* at 81.

[19] *Id.*

[20] 607 P.2d 1173 (N.M. Ct. App. 1980).

[21] *Id.* at 1175–76.

before the Court that Willman was operating a sole proprietorship under the name "Craftsman Exteriors" at the same time.

It seems unlikely that Willman would procure insurance for the sole proprietorship and not his corporation. Rather, amending the Policy to extend coverage to Craftsman Exteriors demonstrates an intent to include Craftsman Exteriors, Inc. within the Policy's coverage. After all, such an amendment would be entirely unnecessary were Willman intending to insure only his sole proprietorship, as Willman and his sole proprietorship were already legally one person. Therefore, despite lacking "Inc." in the Policy itself, a reasonably prudent person could interpret the Policy's coverage as extending to Craftsman Exteriors, Inc. based on the apparent intent of the parties. Because the Policy's language is ambiguous, it must be construed against Defendant regardless of what Defendant subjectively intended. Accordingly, the Court finds that the Policy coverage extended to Craftsman Exteriors, Inc.

       2.       *Was Craftsman Exteriors, Inc. a party to the Underlying Case?*

In arguing that it had no duty to defend, Defendant argues that regardless of the Policy's coverage of Craftsman Exteriors, Inc., that party was not named in the Underlying Case. Defendant's sole reasoning is that because Willman changed Craftsman Exteriors, Inc.'s name to Craftsman Services, Inc. without changing the Policy language, the Policy no longer applied. Defendant fails to cite to any supporting authority for its contention that a simple name change can relieve a party from all contractual rights and obligations. Therefore, the Court finds this argument unpersuasive and without legal basis. The Complaint named Craftsman Services, Inc., and then clearly identified Craftsman Exteriors, Inc., as that entity's previous name. A plain and clear view of the matter is that Craftsman Exteriors, Inc., an entity covered by the Policy now operating under its new name, was a named defendant in the Underlying Case.

3.      *Did Defendant breached its duty to defend Craftsman Exteriors, Inc.?*

Because Craftsman Services, Inc., was covered by the policy, Defendant had a duty to defend it in the Underlying Case.[22]   It is undisputed that Defendant did not at any time defend Craftsman Services during the lawsuit.  Rather, the parties dispute two separate intertwined factual issues: (1) whether Defendant actually denied coverage to Craftsman Services by sending a letter of denial and (2) if so, whether that denial was proper under the terms of the Policy and the facts of this case.

The Court finds that there is a genuine dispute of material fact as to the first issue, rendering the second immaterial at the summary judgment stage.  Here, the facts are controverted as to whether Defendant issued its letter of denial.  On Defendant's side, the designated representative for the USAC testified that the letter was sent.  Plaintiff admits that the representative testified as such but controverts that the letter was sent.  Plaintiff points to the absence of any record of the letter being sent in Defendant's files, the presence of draft letters each containing the phrase "proposed letter of denial," and the USAC representatives' statement that he had never seen the letter go out, never seen a draft of it not containing the "proposed letter of denial" disclaimer, nor had he ever seen any letter delivered which contained that disclaimer.  Furthermore, Willman has testified that he never received Defendant's letter.  It is not the Court's job to weigh the credibility of the evidence at this time.  Drawing all reasonable inferences in favor of Plaintiff, as required by law, there exists a genuine issue of material fact as to whether the letter was sent out and, therefore, a genuine issue of material fact as to whether Defendant denied coverage.

---

[22] Briefly, Defendant states that it had no duty to defend because it was not explicitly asked to defend.  Defendant cites no legal authority in support of its argument.  Therefore, the Court finds this argument indefensible.

Defendant draws the Court's attention to the common law mailbox rule. The rule states that "proof of mailing of a properly addressed communication bearing proper postage creates a rebuttable presumption the communication was received."[23] Because "[a]llegations about mailing are easy to make and hard to disprove," the addressee's testimony that the letter was never received is not, by itself, enough to rebut that presumption.[24]

There is no evidence before the Court that the letter bore proper postage or the proper address—only that it was sent. Leaving this aside for the moment, Plaintiff's evidence is sufficient to overcome the mailbox rule presumption of delivery. Admittedly, Willman's testimony that the letter was not received would not have been enough to rebut that presumption. However, Plaintiff has also shown an absence in Defendant's records of the letter ever being sent or even making it past the draft stage. Therefore, the mailbox rule does not apply in this case, leaving a genuine issue of material fact as to whether the letter was ever sent. Because a genuine issue of material fact exists as to whether Defendant denied coverage at all, the Court need not address whether Defendant's denial of coverage would have been warranted under these facts.

### 4. Did Willman relieve Defendant of its duty to defend by first breaching the cooperation clause?

"[U]nder Kansas law, an insurer is relieved from liability under an insurance contract only if a breach of the cooperation clause causes substantial prejudice to the insurer's ability to defend itself."[25] However, if the insurer breaches the insurance agreement prior to the insured breaching the cooperation clause, then the insurer cannot raise failure to cooperate as a defense.[26]

---

[23] *Sorrentino v. I.R.S.*, 383 F.3d 1187, 1188 (10th Cir. 2004)

[24] *McFarland v. UPS Ground Freight, Inc.*, 2014 WL 3740086, at *6 (D. Kan. 2014).

[25] *Youell v. Grimes*, 217 F. Supp. 2d 1167, 1174 (D. Kan. 2002).

[26] *See id.* at 1175.

Here, the timeline becomes important.  First, Willman failed to notify Defendant of the lawsuit against him when he was sued on January 19, 2018.  This was in itself a breach of the cooperation agreement.  However, Defendant has not shown that it was substantially prejudiced by this breach.  Therefore, Willman's initial breach alone is not enough to relieve Defendant of liability.

Second, Defendant received notice of the suit against Willman on November 18, 2018. There is a distinct lack of caselaw discussing the chronological point at which a duty to defend arises.  Whether Defendant's duty arose at the time the complaint was filed or when it received notice, Defendant did not defend Willman or Craftsman Services, Inc. in any way.  As discussed above, Defendant at the very least intended to deny coverage, but that still would not explain how it would relieve Defendant of the duty to defend while its investigation was pending.  Regardless, because there is a genuine issue of material fact as to whether Defendant denied coverage, there is a genuine issue of material fact as to whether Defendant breached its duty to defend.  Because this duty would date back to when it received notice of the suit, for the purposes of this Motion, Defendant first breached its duty to defend in November 2018.

Third, Willman began negotiating the settlement agreement with Plaintiff sometime in the summer of 2019.  At this point, Defendant had already breached its duty to defend.  Therefore, Defendant cannot use Willman's breach of the cooperation clause in negotiating then entering into the Settlement Agreement with Plaintiff as a reason for denying liability.  Accordingly, Defendant is not entitled to summary judgment on this issue.

**B.**     **The court's judgment in the underlying case was reasonable**

In *Glenn v. Fleming*,[27] the Kansas Supreme Court first established the burden-shifting test for testing the reasonableness of damages for a settlement agreement made between an insured and the party now suing the insurer.[28]  As further defined by later decisions, the *Glenn* test first requires the plaintiff to present a prima facie case showing that the settlement amount was reasonable.[29]  To meet this burden, the plaintiff must present, "at minimum, enough information for the district court to make an independent evaluation of the reasonableness of the settlement."[30] As just one example, a plaintiff might submit "affidavits with documentation" to meet this burden, although independent expert testimony may be necessary in complex or nuanced cases.[31]  Once the plaintiff presents sufficient evidence of reasonableness, "[t]he ultimate burden of proving that the settlement was made in bad faith or that it was unreasonable would then rest with the insurer."[32]

Both parties cite extensively to *O'Shea v. Welch*[33] in their respective briefings, each arguing that this case supports their position.  Surprisingly, neither party cites to the Kansas Court of Appeals' most recent decision dealing with this exact issue, *Gruber v. Estate of Marshall*.[34]  In that case, the court addressed whether the *Glenn* test applied "to an uncontested judgment after an assignment and agreement not to execute where the agreement does not set the amount of

---

[27] 247 Kan. 296, 799 P.2d 79 (1990).

[28] *See id.* at 92–93.

[29] *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65, 87 (1997).

[30] *Id.*

[31] *Id.*

[32] *Glenn*, 799 P.2d at 93.

[33] 2004 WL 2457802 (D. Kan. 2004).

[34] 59 Kan. App. 2d 297, 482 P.3d 612 (2021), *rev. denied* (Apr. 23, 2021).

damages."[35]   Simply put, the *Glenn* test is generally inapplicable where the trial court made a full

and complete finding of damages.[36]   "[A] contrary holding would encourage insurers to not defend

questionable claims and instead wait to collaterally attack any judgment rendered against their

insured."[37]   This is because "unlike cases in which the amount of judgment was set by a settlement

agreement, the insurer could have protected itself by intervening in the case."[38]

Despite these statements, the court went on to state that "[e]ven when a judgment amount

is not agreed upon, there is still a potential that the ultimate judgment amount will not reflect the

true value of the claim when the plaintiff's evidence is not tested by the defendant."[39]   Although

this type of proceeding is "not a true consent judgment, application of some form of the *Glenn* test

is prudent."[40]   However, the court did not opine on what form that test should take.[41]

Judge Lungstrum's decision in *O'Shea* is helpful as an analogous example of the *Glenn*

test applying to a judgment made by a trial court.   There, Judge Lungstrum reviewed the

reasonableness of a judgment amount for a personal injury claim where the insured had entered

into a consent judgment, assigned his rights, and agreed to a covenant not to execute.[42]   The amount

---

[35] *Id.* at 628 (quoting *Dyer v. Holland*, 1997 WL 807866, at *6 (D. Kan. 1997)).

[36] 482 P.3d at 628 (2021).

[37] *Id.*

[38] *Id.*; *see also Dyer v. Sports World, Inc.*, 185 F.3d 874 (table), 1999 WL 482078, at *4 (10th Cir. 1999) ("[T]he Agreement between the parties in the present case specifically stated that the amount of damages was to be determined by the district court, which it was. We reject counsel's suggestion that *Glenn* permits an [insurer's] challenge to the reasonableness of the judgment entered in the underlying proceeding in the ensuing garnishment proceeding. [Insurer] lost its opportunity to challenge the judgment entered in the underlying proceeding, both as it relates to the court's finding of negligence and the amount of damages, when it failed to appear and defend [insured] in the underlying proceeding.").

[39] *Id.* at 629.

[40] *Id.*

[41] *Id.*

[42] *O'Shea*, 2004 WL 2457802 at *1.

-14-

had been determined by a trial court at a bench trial.[43]  In their agreement, the parties had stipulated that only the plaintiff would present evidence of damages and the insured would not object to any of that evidence.[44]  Ultimately, the trial court awarded "$27,986.12 for past medical expenses; $236,517.66 for future medical expenses; $35,000.00 for past lost earnings; $465,000.00 for future lost earnings; and $250,000.00 for pain and suffering."[45]  In arriving at this damage figure, the trial court specifically noted that "it found 'grist for cross-examination' and questioned 'whether it would arrive at the same result in a true adversary proceeding.' "[46]

In front of Judge Lungstrum, the plaintiff failed to present any independent evidence of the reasonableness of the judgment.[47]  Lacking this evidence, Judge Lungstrum considered the "significant possibility" that the insured and the plaintiff had acted in bad faith by colluding to increase the plaintiff's damages.[48]  Specifically, Judge Lungstrum noted that the insured had no incentive to argue against the plaintiff's damages because of the covenant not to execute, neither party had notified the insurer of the agreement or the bench trial prior to those taking place, and there was "no suggestion that the parties to the agreement had any negotiations whatsoever on damages."  Therefore, Judge Lungstrum refused to find that the judgment amount was reasonable as a matter of law.[49]  However, even considering all the factors listed above, Judge Lungstrum also stated that he could not "conclude, as a matter of law, that the judgment is unreasonable on the

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at *6.

[46] *Id.*

[47] *Id.* at *7.

[48] *Id.*

[49] *Id.* at *8.

record before [the court]."[50]  Instead, he decided to "have the jury in the underlying case try all

issues relating to plaintiff's damages so that if the court ultimately concludes that the judgment is

unreasonable . . . then the parties will not be required to try the damages issues to another jury."[51]

Although the present case bears a strong resemblance to the facts in *O'Shea*, it differs in

some respects.  First, Plaintiff has presented at least some independent evidence of its damages

before this Court by providing the invoices from the companies for the work performed on

Plaintiff's roof.  Had Plaintiff submitted an affidavit stating that these invoices were paid, as

contemplated by the Kansas Supreme Court, the Court would have little trouble finding that

Plaintiff had met its initial burden.  Plaintiff's failure to do so puts its case on rockier ground.  Still,

Plaintiff has also presented evidence that other competing bids to replace Plaintiff's roof were

consistently over $1 million, which supports finding that $858,954.93 was a reasonable amount to

pay for the roof's replacement.  Second, this is not a personal injury case where damages seldom

have a fixed number that can be easily determined.  Rather, this is a straightforward contract claim

which does not require independent expert testimony to establish the reasonableness of Plaintiff's

damages.  Plaintiff received nothing more in the settlement than what (at least some evidence

shows) it had paid to have the roof replaced.  While undoubtedly a close call, drawing all

reasonable inferences in favor of Plaintiff requires the Court to find that Plaintiff has met its prima

facie burden to show that $858,954.93 constituted a reasonable amount of damages.

Defendant takes no time to argue that amount awarded was itself unreasonable.  Instead, it

argues that Plaintiff and Willman acted in bad faith.  As the *Gruber* court makes clear, bad faith

---

[50] *Id.*

[51] *Id.*

and collusion is but one of several factors to consider when determining the ultimate question of whether the judgment amount was reasonable.[52]  "Factors that show whether a settlement is collusive include arm's-length bargaining, unrealistic computation of damages, absence of discounting, and secrecy."[53]

Like the insured in *O'Shea*, Plaintiff and Willman entered into a covenant not to execute. Willman also agreed in the Settlement Agreement that "[d]amages will be determined by the trial court at a hearing on the basis of evidence submitted by [Plaintiff]."  Although this does not specifically state that Willman could not present evidence or context Plaintiff's evidence, it certainly implied that.  Indeed, only Plaintiff presented evidence at the evidentiary hearing, hardly resulting in an adversarial process.  There is no evidence before this Court as to whether Willman objected to any of Plaintiff's evidence.  Therefore, the Court finds that there is at least some evidence of bad faith collusion.

Defendant has not, however, met its ultimate burden of showing that the amount reached was unreasonable.  Indeed, Defendant does not argue for a lower amount of damages or make any showing that Plaintiff's damages were other than those awarded in the Underlying Case. Furthermore, this case differs from *O'Shea* in that Defendant "could have protected itself by merely showing up"[54] and defending Craftsman Services when the original petition was filed.  As discussed above, a genuine issue of material fact exists as to whether it breached its duty to defend. Had it defended Craftsman Services, it would have been privy to all the parties' negotiations

---

[52] *See Gruber*, 482 P.3d at 628 (listing "any evidence of bad faith, collusion, or fraud" under "factors [which] may be considered to determine reasonableness of the settlement amount").

[53] *Id.*

[54] *Brockmann v. Bd. of Cnty. Comm'rs of Cnty. of Shawnee*, 404 F. App'x 271, 280 (10th Cir. 2010) (citing *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 89 P.3d 573, 580–81 (2004)).

regarding the Agreement.  At least for the purpose of summary judgment, Defendant cannot rely on the parties' failure to provide it notice of the settlement agreement or the swift turnaround between settlement and the evidentiary hearing as evidence of bad faith.  The evidence of bad faith that exists, without more, is not enough to meet Defendant's burden to show that the judgment in this case was unreasonable.  Therefore, the Court denies Defendant's Motion on this ground.

## C.   The issue of attorney fees under K.S.A. § 40-256 is inappropriate for summary judgment when genuine issues of material fact remain in the Underlying Case.

Under K.S.A. § 40-256, a prevailing party is entitled to reasonable attorney fees if the evidence shows that an insurance company "has refused without just cause or excuse to pay the full amount of such loss."  Naturally, this is a higher standard than whether an insurance company wrongfully refused coverage.  Regardless, attorney fees are only proper after "judgment is rendered against any insurance company."[55]  "The question of whether an insurer has refused to pay without just cause or excuse is one of fact for the trial court."[56]

Given that the award of attorney fees is not a jury issue, addressing this argument at summary judgment when genuine issues of material fact exist in the underlying case seems premature.  Furthermore, it is unclear just what the standard would be for denying summary judgment.  Whether the case warrants attorney fees is a fact issue for the Court to decide. Accordingly, denying summary judgment if a "genuine issue of material fact" exists seems a bit absurd because it is the Court that must determine those issues of fact anyway.  Were the Court to make findings of fact at this point in the litigation, it would essentially usurp the role of the jury. This is especially true when Plaintiff's claim rests on proving Defendant's failure to defend, which

---

[55] K.S.A. § 40-256.

[56] *Evans v. Provident Life & Acc. Ins. Co.*, 249 Kan. 248, 815 P.2d 550, 561 (1991).

-18-

relies upon many of the same factual issues required to determine if Defendant denied coverage without just cause.  Tellingly, each of the cases cited by either party dealt with an award of attorney fees after judgment for the plaintiff had been entered.[57]

If the Court had entered summary judgment for Defendant, then summary judgment on this issue would naturally follow.  When, as here, there remain genuine issues of material fact not only to the validity of Defendant's failure to defend but even regarding whether it denied coverage at all, summary judgment regarding attorney fees is inappropriate.  The Court will better be able to determine whether Defendant had just cause to deny coverage after a jury decides the underlying facts.  Should judgment be entered in favor of Defendant, this issue will become moot.  Therefore, the Court denies Defendant's Motion on this point without prejudice to refiling after judgment.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 38) is **DENIED.**

**IT IS SO ORDERED.**

Dated this 27th day of October, 2022.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[57] *See id.* at 553, 560–61 (addressing attorney fees after jury trial); *Wiles v. Am. Fam. Life Assur. Co. of Columbus*, 302 Kan. 66, 350 P.3d 1071, 1076 (2015) (addressing award of attorney fees after judgment in bench trial); *Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F. Supp. 2d 1164, 1183–84 (D. Kan. 2012) (awarding attorney fees only after addressing parties' cross-motions for summary judgment and ruling in favor of plaintiff).